| | | | |
|---|---|---|---|
| **Carrier ID:** | 3728558 | | |
| **Carrier Name:** | Roma Corp | **Agreement Date:** | 12/2/2022 9:34:17 AM (Pacific Time) |
| **Address:** | | **MC Number:** | MC1416559 |
| **City, State & Zip:** | Dyer, IN 463111967 | **US DOT Number:** | 3870039 |
| **Contact:** | | **Phone:** | 219-240-1233 |

# CARRIER AGREEMENT
# VERSION 8/1/2021

This Carrier Agreement (hereinafter "Agreement") is made and entered into this 2 day of December, 2022, (the "Effective Date"), by and between **COYOTE LOGISTICS, LLC,** a Delaware limited liability company ("BROKER"), and Roma Corp, with its principal office at 1003 Dune Sand Ct , Dyer, IN 463111967 ("CARRIER", together with BROKER, the "Parties").

WHEREAS, BROKER is authorized by the Federal Motor Carrier Safety Administration ("FMCSA") to operate as a Registered Property Broker pursuant to License issued in Number MC-561135-B;

WHEREAS, CARRIER is licensed by the FMCSA to operate as a for-hire motor carrier pursuant to authority issued in DOT Number: 3870039;

WHEREAS, the transportation service provided by CARRIER is intended by the Parties to be contract carriage as defined in 49 U.S.C. § 13102(4) and § 14101(b) and the Parties hereto intend that the contractual arrangement be continuous in nature until this Agreement is terminated; and

NOW THEREFORE, for and in consideration of the mutual covenants and undertakings herein, the Parties hereto warrant, covenant and agree as follows:

1. **SCOPE OF WORK**. BROKER agrees to cause freight to be tendered to CARRIER, and CARRIER agrees to pick up, transport, and deliver such freight and provide all such services as BROKER shall request on all freight tendered by BROKER as set forth in a Load Confirmation Sheet (the "Services"). CARRIER warrants and agrees that all freight tendered to it by BROKER pursuant to this Agreement shall only be transported by CARRIER on, in or with equipment owned by CARRIER or leased to CARRIER under a lease having a duration of more than thirty (30) days and operating under CARRIER's operating authorities. CARRIER shall not, in any manner, subcontract, broker, or tender to any third party for transportation any freight tendered to CARRIER by BROKER for transportation pursuant to this Agreement, except to the extent CARRIER uses the services of an owner/operator and provided that the owner/operator is providing such transportation services and operating equipment duly authorized under CARRIER's operating authority. In addition to other remedies conferred by this Agreement, any violation of this article shall act as a bar to CARRIER's right to collect payment for any shipment handled in a manner which violates this article.

2. **APPLICABILITY**. This Agreement shall apply to all shipments in the United States, Canada, and/or Mexico, and any shipments within or between any of the foregoing.

3. **APPENDICES, SCHEDULES, AND EXHIBITS.** All appendices, schedules, and exhibits hereto agreed by the Parties in writing (each, an "Incorporated Document") are made a part of this Agreement and incorporated herein whether such Incorporated Document was executed at the time that this Agreement was executed or at some later date. Each such Incorporated Document is intended to be a supplement to this Agreement and not a separate contract or agreement. In the event of a conflict between the terms of this Agreement and the terms of any Incorporated Document, the terms of the Incorporated Document shall control.

4. **TERM OF AGREEMENT**. The term of this Agreement shall be for a period of one (1) year (the "Initial Term") and shall automatically renew for additional one (1) year periods (each, a "Renewal Term" and the Initial Term and any Renewal Terms collectively referred to as the "Term"); provided that this Agreement may be terminated by either Party at any time upon thirty (30) days' written notice to the other.

5. **CARRIER WARRANTIES AND REPRESENTATIONS TO BROKER AND ITS CUSTOMERS**.

   CARRIER warrants and represents the following:

   A. CARRIER is in, and shall continuously maintain, full and strict compliance with all statutes, rules, and regulations governing its operations and the Services provided by CARRIER pursuant to this Agreement, including, but not limited to, adherence to provisions of the Interstate Commerce Act and related laws, rules, and regulations of the FMCSA and all provisions of applicable state and local laws, rules, and regulations to the extent they govern CARRIER's operations or the Services provided hereunder. If shipments under this Agreement are tendered in Canada, or for delivery to Canada, CARRIER will not accept such shipments unless CARRIER is in full compliance with the applicable federal and/or provincial laws of Canada.

   B. To the extent that any shipments subject to this Agreement are transported within the State of California, CARRIER shall comply with all California Air Resources Board ("CARB") regulations. CARRIER shall be liable to BROKER and its customer or the shipper (either, a "Customer") for any penalties or other liability imposed on or assumed by BROKER or its Customer arising out of CARRIER's non-compliance with CARB regulations or use of non-compliant equipment.

   C. CARRIER does not have an "unsatisfactory" or "unfit" safety rating issued by the FMCSA and will notify BROKER in writing immediately if its safety rating is changed to "conditional," "marginal," "unsatisfactory," or "unfit." In the event CARRIER is issued a "conditional" or "marginal" safety rating, CARRIER shall use commercially reasonable efforts to improve such ratings and shall provide BROKER with a periodic documented action plan of such improvement efforts.

   D. CARRIER will provide, operate, and maintain in sati[...] motor vehicles, trailers, and equipment necessary to perform Services pursuant to this Agreement. CARRIER will [...]d drivers, (ii) ensure that each driver is suitably trained for

EXHIBIT 1

operation of vehicles and other equipment, (iii) procure all licenses, permits, authorizations, and other governmental approvals necessary for the ownership and use of such vehicles, (iv) furnish at its sole expense all supplies, fuel, oil, tires, parts, service, maintenance, and repair in connection with the use and operation of its vehicles and equipment and that may be required to keep the vehicles and equipment in good repair and mechanical condition, and (v) bear all costs of providing the transportation service. CARRIER shall notify BROKER immediately if any equipment is defective or is not in compliance with applicable laws and regulations.

E. All vehicles and equipment used for Services shall be clean, odor free, dry, leak proof, and free of contamination and infestation. No vehicle that transports goods for BROKER under this Agreement will ever have been used to transport refuse, garbage, trash, or solid or liquid waste of any kind whatsoever, whether hazardous or non-hazardous. CARRIER further warrants that (i) all equipment provided by CARRIER for the transportation of food grade products will comply with the requirements of the Sanitary Food Transportation Act ("SFTA") and the Food Safety Modernization Act ("FSMA"), (ii) none of the equipment provided for the transportation of food or food grade products has been or will be used for the transportation of any waste of any kind, garbage, hazardous materials, poison, pesticide, rodenticide, or any other commodity that might adulterate or contaminate food, food products, animal feed, or cosmetics, and (iii) no freight transported pursuant to this Agreement shall become or shall be deemed to be adulterated or misbranded within the meaning of the Federal Food Drug and Cosmetic Act, the Federal Meat Inspection Act, or the Federal Poultry Products Inspection Act, or any other federal, state or local law or regulation of similar kind or content as a result of the Services or equipment provided by CARRIER hereunder. Food grade products that have been transported under conditions that are not in compliance with the requirements of the SFTA, the FSMA, or any other federal, state, or local law or regulation of similar kind or content or BROKER's or Customer's instructions, as provided to CARRIER by BROKER or Customer, will be considered "adulterated" within the meaning of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 342 (i). Should CARRIER violate this Section, it shall be liable for all claims occurring as a consequence thereof.

i. CARRIER will also ensure that, in connection with goods that are specified by BROKER or Customer as requiring temperature, humidity, or other climate control, all vehicles provided for transportation of such goods will be suitable for the purpose intended and operated in compliance with reefer units properly and regularly maintained. CARRIER shall, upon request, provide temperature downloads evidencing the temperature of the trailer for such shipments from time of pick-up to the time shipment is delivered. Customer and BROKER shall have the right to deem an entire shipment damaged in the event CARRIER does not provide such downloads. CARRIER shall ensure it is advised of all necessary instructions, through BROKER or Customer, of the nature of the freight for transport and any special handling instructions and temperature control instructions if not otherwise stated within the Load Confirmation Sheet. To the extent that CARRIER receives any contradictory or confusing information or instructions regarding any freight from whatever source, CARRIER must resolve any contradictory or confusing instructions prior to accepting physical tender of the freight for transport. Failure to resolve any issue with the instructions prior to transport shall bar CARRIER from using the contradictory or confusing instructions as a defense to any claim.

ii. CARRIER understands and agrees to be responsible for applicable sanitary conditions for the transportation of food grade products and has assumed all obligations delegable to the CARRIER under the FSMA, including without limitation the obligations found within 21 C.F.R. §§ 1.908, 1.910, including, without limitation, the development and maintenance of written procedures and adequate training related to the sanitary conditions during transportation operations.

iii. CARRIER shall retain all necessary documents and records as required by law, including without limitation those records required under 21 C.F.R. § 1.912, as both the carrier and shipper thereunder. CARRIER shall make such documents available to BROKER upon request for at least two (2) years after the termination of this Agreement.

F. CARRIER shall not perform Services that would require CARRIER or any of its contractors, employees, or others to exceed or violate any applicable laws, rules, or regulations.

G. CARRIER's Handling of Freight:

i. CARRIER will transport all shipments tendered pursuant to this Agreement to the specified consignee at the specified destination at the time specified or within a reasonable time if there is no time specified. The Parties agree and recognize that time is of the essence of this Agreement and that due to varying geographical origins and destinations together with the need for expeditious transportation, both Parties will commence performance under this Agreement immediately following the written or oral tender of a shipment to CARRIER by BROKER, whichever occurs first. It is understood that all shipment handling requirements and instructions are those of BROKER's Customers and that CARRIER will comply with all such requirements and instructions.

ii. Missed delivery appointments may result in the imposition of fees and penalties by BROKER's Customers, shippers, or consignees of shipments for which CARRIER shall be liable.

iii. The temperature of the product is a material condition of this Agreement. CARRIER is responsible at the time of loading for probing any product designated as requiring temperature controls in transit and writing the temperature on the Bill of Lading ("BOL") or shipping receipt. If the product temperature is more than two (2) degrees different from the required temperature stated on the tender documents, CARRIER shall refuse the shipment and immediately contact BROKER.

H. CARRIER hereby assigns to BROKER any and all rights held by CARRIER to bill any party to the BOL contract and shall bill only BROKER for the Services herein. CARRIER agrees that BROKER's Customers are intended to be third party beneficiaries of this Agreement. CARRIER will not communicate, directly or indirectly, in any manner, with BROKER's Customers, consignors, consignees, or any party other than BROKER concerning the collection of any charges in connection with this Agreement. CARRIER hereby waives its right to any lien of any kind on any cargo, freight, or other property of BROKER or any of BROKER's Customers. It is acknowledged and agreed that BROKER is acting as an independent contractor and not as the agent of any of its Customers.

I. To the extent that any shipments tendered hereunder constitute Hazardous Materials, CARRIER is in, and shall maintain, full and strict compliance with all

applicable federal, state, and local laws and regulations relating to the transportation of Hazardous Materials, (including, but not limited to, insurance, licensing, permitting, training of drivers, and cargo security), as defined in 49 C.F.R. part §172 et seq. and part §397 et seq. CARRIER will be responsible for any handling, clean-up, or disposal of such Hazardous Materials and will indemnify and hold BROKER and its Customer harmless from all claims, liabilities, losses, fines, legal fees, and other expenses arising out of transportation of, contact with, exposure to, or release of any Hazardous Materials or any remedial action required under applicable federal, state, or local environmental laws, except to the extent any such claims, liabilities, losses, or fines are caused by the negligence or willful misconduct of BROKER or Customer. When CARRIER is required by U.S. D.O.T. to complete a written report (Form DOT 5800.1, "Hazardous Materials Incident Report," per 49 C.F.R. 171.15 or 49 C.F.R. 171.16) detailing an incident involving hazardous materials shipped pursuant to this Agreement, CARRIER must also deliver a copy of the report to BROKER within ten (10) business days of filing the report with U.S. D.O.T.

J. Each Party will notify the other immediately if its operating authority is revoked, suspended, or rendered inactive for any reason; if the Party is sold or there is a change in control of ownership of the Party; or if any insurance required hereunder is threatened to be or is terminated, cancelled, suspended, or revoked for any reason.

K. CARRIER shall make all arrangements it deems appropriate to provide sufficient and appropriate personnel and equipment, which shall be dedicated to BROKER's exclusive use while transporting freight tendered by BROKER, to provide the Services contemplated by this Agreement. CARRIER shall not commingle any other freight with that tendered by BROKER.

L. CARRIER has security procedures in place reasonably designed to protect the cargo from loss or damage and will comply with all such procedures. CARRIER agrees as follows:

i. The following minimum requirements shall be observed with respect to locking systems and security seals: (a) any padlocks used must have a solid steel shackle (locking bar) with a minimum diameter of 11mm and a steel key housing and (b) any security seal used must be a serialized device of metal or plastic composition and must be attached to a trailer door in a manner that will provide evidence of any tampering with the trailer or its contents.

ii. Stored, staged, or unattended trailers containing BROKER's Customer's freight must be secured by means of one or more of the following: (a) King Pin lock with padlock meeting the aforementioned padlock standards; (b) Model G Air Lock/Quadralock; (c) TS3 Air Lock; (d) backed with trailer doors secured against a solid wall structure or secure adjacent trailer; and (e) at a secure facility or area owned or leased by CARRIER that is under constant physical or electronic surveillance. During driver/tractor switching, both drivers must be present.

M. In the event that CARRIER utilizes a trailer, container, chassis, or other equipment owned by, leased to, or provided by BROKER or its Customer ("Trailer(s)") for the performance of the Services contemplated hereunder, CARRIER shall be liable for any damage to Trailers, destruction of Trailers, theft from Trailers, theft of any contents of Trailers, and for any claims for bodily injury (including death) or property damage arising from or related to any accident involving Trailer(s) regardless of whether such damage, injury, destruction, or theft is caused or occurs while the Trailer is attached or unattached to any power unit operated by CARRIER. In no event will any such Trailer be used for any purpose other than performing Services hereunder and in no event will CARRIER allow any third party to operate any such Trailer. CARRIER shall perform a pre-trip inspection of the Trailer as required by law. CARRIER ACKNOWLEDGES AND AGREES THAT NEITHER BROKER NOR THE CUSTOMER MAKE ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE TRAILER INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR USE.

N. BROKER's Customers may require additional warranties, shipping requirements, and/or terms ("Additional Terms") in connection with a shipment tendered by BROKER to CARRIER hereunder. To the extent any such Additional Terms are provided to CARRIER, CARRIER agrees that the tender of such shipment is conditioned on CARRIER's acceptance of such Additional Terms. CARRIER's provision of the Services after such Additional Terms are made available to CARRIER in writing shall be deemed acceptance of such Additional Terms. In the event CARRIER does not agree to such Additional Terms, CARRIER must reject the tender and will not provide Services with respect to such shipment.

O. CARRIER must be able to provide shipment tracking and tracing via (i) a website owned, controlled, and/or managed by CARRIER, (ii) CARRIER's electronic logging device ("ELD") system, (iii) CARRIER's transportation management system ("TMS"), (iv) a mobile application provided by or on behalf of BROKER downloaded by CARRIER's drivers, or (v) enable BROKER to send text messages to and/or track locations using the CARRIER's driver's mobile phone numbers. CARRIER represents and warrants that it has obtained a written agreement from each driver transporting a shipment tendered by BROKER to CARRIER pursuant to the Agreement in which each driver provides all necessary consents to (i) receiving text messages and/or phone calls from or on behalf of BROKER and (ii) allowing BROKER or its vendor to track such driver's location while transporting such shipment. CARRIER agrees to provide BROKER a copy of such written agreement upon request. CARRIER shall comply with all applicable laws relating to the collection, use, storage, retention, disclosure, and disposal of any information CARRIER provides to BROKER, including information regarding the drivers transporting shipments. Such laws include, without limitation, the Telephone Consumer Protection Act ("TCPA") (47 U.S.C. § 227) and its implementing regulations (47 C.F.R. § 64.1200). Compliance with the TCPA includes, but is not limited to, obtaining any necessary consents from drivers to receive text messages and phone calls from or on behalf of BROKER. CARRIER shall indemnify, defend and hold BROKER and its affiliates and Customers harmless from and against any and all claims, damages, liabilities, losses, actions, and expenses (including attorneys' fees) arising out of or in connection with CARRIER's breach of this Section. This indemnification is in addition to the indemnification provided for in Section 13. This Section 5(O) shall survive the cancellation, expiration, or termination of this Agreement

P. CARRIER acknowledges and agrees that BROKER may use Registry Monitoring Insurance Services, Inc. ("RMIS") or other third-party vendors in connection with CARRIER's registration to do business with BROKER. CARRIER agrees that any personal information provided by CARRIER in connection with such registration process may be shared with BROKER's vendor providing registration services and CARRIER directs BROKER to provide CARRIER'S personal information to such vendor. In addition, CARRIER agrees that the vendor providing registration services to BROKER may share CARRIER's contact information and insurance information with other customers of such vendor.

6. **PROCESSING OF PERSONAL INFORMATION**

A. The following definitions shall apply for the purposes of this Section 6:

i. "Broker Data" means any or all of the following, and all copies thereof, regardless of the form or media in which such items are held: (a) confidential information of BROKER, including Personal Information (as defined herein); (b) data and/or information provided or submitted by or on behalf of BROKER to CARRIER regardless of whether considered confidential information; and (c) data and/or information submitted, stored, recorded, processed, created, derived, or generated by CARRIER as a result of and/or as part of the provision of Services, regardless of whether considered confidential information.

ii. "Personal Information" means any and all information in any medium or format which CARRIER accesses or acquires from BROKER or its affiliates, which BROKER or its affiliates provide to CARRIER, or which CARRIER collects or acquires on behalf of BROKER or its affiliates that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer, household, or device. Without limitation, "Personal Information" includes information qualifying as "personally identifying information," "nonpublic personal information," "nonpublic information," "personal data" and similar terms under law.

iii. "Security Incident" means any act or attempt, successful or unsuccessful, to gain unauthorized access to, disrupt or misuse an information system or information stored on such information system, including any unauthorized access, acquisition, disclosure or use of Broker Data.

B. CARRIER will use and process Broker Data in compliance with applicable law at all times. CARRIER shall ensure that all CARRIER personnel engaged in the use or processing of Broker Data agree to maintain the confidentiality of such Broker Data and comply with the other relevant obligations and restrictions of this Section 6.

C. CARRIER will use and process Broker Data solely for the purpose of performing the services and/or other obligations of CARRIER under this Agreement and in accordance with BROKER's instructions as issued from time to time in writing. With regard to Personal Information which CARRIER may collect, receive, or otherwise use or process as a result of this Agreement, CARRIER shall not:

i. Sell, rent, release, disclose, disseminate, make available, transfer, or otherwise communicate orally, in writing, or by electronic or other means, Personal Information to another business or a third party for monetary or other valuable consideration; or

ii. Retain, disclose, collect, sell, use, or otherwise process Personal Information for any purpose other than for the specific purpose of, and as necessary for, performing the Services specified in the Agreement. For clarity, CARRIER may not retain, use, or disclose the Personal Information for any other commercial purposes or outside of the direct business relationship between CARRIER and BROKER. By execution of this Agreement, CARRIER hereby certifies that it understands the specific restrictions contained in this Section 6(D) and will comply with the same.

D. CARRIER will notify BROKER promptly via email at **privacy@coyote.com** within 2 business days if it receives any inquiry, complaint, request or claim (collectively, "**Requests**") from an individual relating to Personal Information, including any individual's request to exercise rights under applicable law with respect to Personal Information provided by or relating to BROKER or its Affiliates. CARRIER will not respond to any such Requests without BROKER's prior written consent except to the extent required by applicable law or as necessary to confirm that the Request relates to BROKER or Broker Data. CARRIER will cooperate fully with BROKER and facilitate BROKER's response to all such Requests. CARRIER will promptly provide any information requested by BROKER relating to CARRIER's Services and/or use or processing of Broker Data which is reasonably necessary for BROKER to respond to a Request.

E. CARRIER will notify BROKER by emailing **privacy@coyote.com** within 24 hours of any Security Incident of which CARRIER becomes aware which affects, or could reasonably be expected to affect, the confidentiality, integrity, or availability of (i) BROKER's information systems or (ii) Broker Data. CARRIER will fully cooperate with BROKER in execution of its security incident response plan and otherwise, and, at BROKER's request, any law enforcement or regulatory officials, credit reporting companies, and credit card associations investigating such Security Incident. CARRIER shall fully cooperate with and assist BROKER in fulfilling BROKER's reporting and disclosure obligations to any third party, including individuals or governmental authorities. CARRIER will not disclose a Security Incident to any individual, regulator, or third party without BROKER's prior written authorization. CARRIER acknowledges that BROKER shall make the final decision on notifying BROKER's customers, employees, service providers and/or the general public of such Security Incident.

7. **BILLS OF LADING.** Upon acceptance of goods for transportation, CARRIER will issue and sign a standard, uniform straight BOL or other receipt acceptable to BROKER and BROKER's Customers. CARRIER acknowledges that a shipper's and/or consignor's identification of BROKER's name on a BOL shall be for the shipper's/consignor's convenience only and such notation shall not affect BROKER's status as a broker. In the event of a conflict between this Agreement and the terms of any BOL, this Agreement shall control; except to the extent the BOL contains specific instruction directly from the Customer not conflicting with any BROKER instruction, in which case the instructions on the BOL shall take precedence. Should a conflict of instructions arise, CARRIER bears the burden to reconcile the conflict prior to physical tender of the freight to the CARRIER.

8. **BONDED MERCHANDISE**. If CARRIER accepts a shipment identified by BROKER as a United States Bureau of Customs and Border Protection ("Customs") bonded shipment, the following provisions shall apply:

A. CARRIER represents and warrants that it holds a valid continuous Customs bond authorizing it to receive and transport Customs bonded merchandise.

B. CARRIER further represents and warrants that it will not store bonded merchandise in any warehouse facility other than an approved Customs bonded warehouse, owned and operated by CARRIER, of the appropriate bond class for the storage of such merchandise.

C. CARRIER shall not release from a Customs bonded warehouse or deliver any cargo until CARRIER has received written communication from BROKER confirming that the merchandise has been cleared.

9. **CUSTOMS-TRADE PARTNERSHIP AGAINST TERRORISM**. If CARRIER is Customs-Trade Partnership Against Terrorism ("C-TPAT") certified, CARRIER shall provide its C-TPAT Certificate or a letter indicating membership and CARRIER's Status Verification Identification to BROKER upon request. Whether or not CARRIER has achieved C-TPAT certification, CARRIER shall comply with C-TPAT security criteria and guidelines with respect to any cross-border Services provided by CARRIER pursuant to this Agreement.

10. **INSURANCE**. CARRIER shall at all times during the Term of this Agreement have and maintain in full force and effect, the following minimum insurance:

A. Commercial Automobile Liability Insurance. Commercial Automobile Liability Insurance with a combined single limit of not less than $1,000,000.00, each accident; provided that $5,000,000.00, each accident, is required if transporting hazardous materials, including a Broadened Coverage for Covered Autos (CA 99 48 03 06) endorsement for environmental damages due to release or discharge of hazardous substances.

B. Comprehensive General Liability Insurance. Comprehensive General Liability Insurance with limits of not less than $1,000,000.00 per occurrence; $2,000,000.00 in the aggregate.

C. Workers' Compensation, Employer's Liability and/or Occupational AccidentInsurance.

i. Protection under all applicable Workers' Compensation Laws at limits required by law; or

i. Employer's liability insurance or Occupational Accident Insurance if Worker's Compensation is not required by statute.

D. Cargo Insurance. A non-scheduled vehicle Cargo Insurance policy with limits of $100,000 per shipment unless higher limits are specified by BROKER. The Cargo Insurance policy must not contain exclusions or sub-limits for theft, fire, hijacking, unattended vehicles, hazardous materials, consumer electronics, new garments, footwear, computer and computer components, and mechanical breakdown of a refrigeration unit subject to the above stated limits and with a deductible of no greater than five thousand dollars ($5,000.00) per occurrence.

E. Certificates of Insurance. Prior to providing Services, CARRIER shall provide certificates of insurance evidencing the insurance coverage required under this Agreement. Certificates shall contain a clause providing that the insurer will not cancel or change coverage without first providing BROKER thirty (30) days' prior written notice.

F. Insurance Policies. BROKER and its Customer shall be named as an Additional Insured and/or loss payee, as applicable, upon request. Policies shall not exclude coverage for infidelity, fraud, dishonesty, or criminal acts of CARRIER's employees, officers, or directors. All insurance must be procured from insurance carriers with a rating of at least A – VII (A MINUS) in the most recent edition of the A.M. Best Key Rating Guide (Property/Casualty) or its equivalent. CARRIER's insurance shall be primary and applicable separately with respect to all insured, and CARRIER's insurer shall be required to respond and to pay prior to other available coverage. CARRIER agrees that CARRIER, CARRIER's insurer(s), and anyone claiming by, through or under CARRIER shall have no claim, right of action or right of subrogation against BROKER or its Customer(s) based on any loss or liability insured under the insurance required under this Section. The failure of CARRIER to secure an appropriate clause in or endorsement to its respective insurance coverage, which waives the right of subrogation as provided for in this Section 10(F), shall not in any manner affect the intended waiver and release and shall be a material breach of this Agreement. CARRIER shall deliver to BROKER full and complete copies of its insurance policies required under this Agreement upon request.

G. Self-Insurance. If CARRIER is self-insured, it shall provide evidence of such, including proof of acceptance of self-insurance status by the FMCSA or other governing agency.

H. No Representation as to Adequacy BROKER does not represent that the types or minimum limits of the insurance set forth herein are adequate to protect the CARRIER's interests, and do not otherwise constitute limits of liability. Deductible amounts under the foregoing policies shall be paid by CARRIER.

11. **COMPENSATION AND PAYMENT**.

A. Rate Agreement. All shipments under this Agreement shall be transported in accordance with the rates agreed by the Parties. The Parties may agree to such rates in writing or orally, provided that BROKER shall send a confirmation to CARRIER of such agreed rates in writing (each, a "Load Confirmation Sheet"), which is hereby incorporated by reference. Unless CARRIER objects to the terms and rates in an individual Load Confirmation Sheet within twenty-four (24) hours after receipt and prior to the pickup of the applicable shipment(s), CARRIER shall be deemed to have assented to and agreed that the terms are fully and correctly stated. All such Confirmations shall become incorporated as addenda to this Agreement, and BROKER and CARRIER agree to retain all such addenda for three (3) years. CARRIER, from time to time, may request that BROKER make early payment of freight charges in exchange for a discount of the agreed rates, which separate agreement may be attached to and become part of this Agreement as Appendix D. If the CARRIER agrees to any early payment program contained in Appendix D.1-3 ("Coyote Advance Program," "Two Day Pay," or "ACH/Direct Deposit"), respectively, the discounted payment shall become the negotiated rate.

B. Mileage and Accessorial Charges. Mileage and accessorial charges applicable to the Services shall be as set forth in Appendix A. CARRIER agrees, represents, and warrants that, other than the rates and charges set forth in this Agreement and any Appendix hereto, there are no other rates, charges, or taxes applicable to the Services.

C. Fuel Surcharge. Unless a separate and distinct fuel surcharge is specifically agreed to by BROKER, in writing, the quoted rate of CARRIER includes any and all fuel surcharges or adjustments.

D. Payment/Procedure.

i. CARRIER shall invoice BROKER within fifteen (15) days after delivery of each shipment and BROKER shall pay CARRIER the agreed

compensation within thirty (30) days after receipt by BROKER of (a) a written Load Confirmation Sheet, duly signed by CARRIER; and (b) CARRIER's freight bill with a legible BOL, without exception or notation, signed by the consignee at point of delivery as proof of delivery of the shipment, on time, on schedule and in good order and condition. Only if no BOL was provided at point of origin will a written and signed delivery receipt be acceptable as a substitute. The foregoing is a condition of payment.

i. CARRIER shall provide proof of delivery to BROKER within twenty-four (24) hours of delivery or request.

iii. Invoices which are received by BROKER more than one hundred twenty (120) days after Services are performed will be deemed waived by CARRIER and will not be paid.

iv. BROKER shall not be required to pay CARRIER any penalties or interest for late payments due hereunder or otherwise, nor shall BROKER be required to forfeit any applicable discounts for any reason whatsoever.

12. **LIABILITY FOR LOSS, DAMAGE OR DELAY.**

A. Carrier Liability. CARRIER shall be liable to BROKER and its Customers for the loss, damage, or delay of any cargo transported hereunder. Except as otherwise specifically provided in this Agreement, CARRIER's liability shall be for full actual loss, subject to the provisions of 49 U.S.C. § 14706 (the "Carmack Amendment") and 49 CFR Part 370 ("Claim Regulations"). To the extent that anything in this Agreement, including, but not limited to, Sections 5 and 12, conflicts with the Carmack Amendment or the Claim Regulations, this Agreement shall take precedence and the Carmack Amendment and Claim Regulations are considered waived to the fullest extent permitted by law pursuant to 49 U.S.C. 14101(b).

Liability under this section shall begin once the cargo is released to the CARRIER for transport and extend until the CARRIER obtains consignee's signature upon the BOL. The measure of damages for loss or damage shall be: (1) for goods sold to a customer of BROKER's Customer, the invoice price to the Customer's customer or (2) for goods not sold to a customer of BROKER's Customer, the destination market value of the goods. CARRIER shall also be liable for BROKER's Customer's reasonable expenses incurred in mitigation of damages, including inspection, sorting, segregating, refurbishing, repackaging, and re-shipping, plus Customer's administrative expenses incurred in connection with the processing of claims against CARRIER. CARRIER agrees to contact BROKER immediately regarding any exceptions (over, short, damaged, or refused) on any loads transported by CARRIER. If any exception happens during a weekend or after hours, BROKER should be notified no later than the next business morning. No released value conditions, whether stated in CARRIER's tariffs, rates, or otherwise, shall apply to the Services.

B. Seal Integrity: CARRIER shall maintain a continuous seal record during the time the trailer is in the custody and control of CARRIER and verify and note the seal number and condition on the BOL. CARRIER shall notify BROKER immediately (at time of first discovery) if the seal integrity is broken.

In the event a shipment that was sealed at origin arrives at the destination with a tampered seal or without the seal intact, then:

i. the CARRIER shall be liable for any shortage or damage claims with respect to such shipment; and

ii. the Customer shall have the right, in its sole discretion, to deem the entire shipment damaged, contaminated, adulterated, and unsalvageable in order to protect its brands and prevent potentially contaminated goods from entering into the stream of commerce, and the CARRIER shall be liable for the full value of the shipment.

C. Concealed Damage Claims. Claims based on a concealed loss or damage reported to CARRIER within five (5) business days of the date of delivery shall be treated by CARRIER as though an exception notation had been made on the delivery receipt at the time of delivery.

D. Damaged or Rejected Shipments. CARRIER shall not salvage or dispose of damaged or rejected product without the prior written consent of BROKER or its Customer. BROKER or its Customer may determine in its sole discretion whether the goods may be salvaged and if salvageable, the value of such salvage.

E. Shipper Load and Count. CARRIER shall not be liable for loss or damage on truckload shipments if trailer is loaded and sealed by shipper or Customer and CARRIER has no opportunity to inspect or count contents of trailer, the trailer is delivered with original seal(s) intact, and there is no evidence indicating that the contents of the trailer were compromised while the trailer was in the CARRIER's possession. Prior to signing the BOL accepting such shipment, CARRIER's personnel shall note on the BOL that they were not allowed or afforded an opportunity to view and/or examine the goods shipped. Failure of CARRIER to make such a notation shall create a rebuttable presumption that the goods were received by CARRIER in the correct quantity and in good condition.

F. Replacement Shipments. CARRIER acknowledges that BROKER may utilize other carriers to facilitate the movement of delayed shipments or to ship replacement goods. If CARRIER fails to timely deliver any shipment, CARRIER shall be liable for all reasonable and necessary costs, charges, fees, and expenses of such alternative like transportation.

G. Return of Damaged or Rejected Shipments. CARRIER shall return all damaged or rejected product to the point of origin or to such other point as instructed by BROKER, at CARRIER's expense (except to the extent such damaged or rejected product was the result of BROKER's or Customer's negligence).

H. Time Limits; Claims and Suits for Loss or Damage. The time limit within which BROKER must file a claim against CARRIER shall be nine (9) months from the date of delivery or within nine (9) months of the scheduled date of delivery if a complete loss. CARRIER shall pay, decline, or make settlement offer in writing on all cargo loss or damage claims within ninety (90) days of receipt. Failure to do so shall be deemed an admission by CARRIER of full liability for the amount. Disallowances shall state a lawful reason for declining the claim and shall be stated by the CARRIER, not its insurer. The time limit within which BROKER must institute suit against CARRIER to recover on a claim shall be two (2) years and a day from the date BROKER receives a written disallowance from CARRIER.

I. Offset: BROKER may withhold as setoff any payment due to CARRIER pursuant to this Agreement to: satisfy advances made to or on behalf of CARRIER, to satisfy any debt owed to BROKER by CARRIER, or to satisfy any cargo damage claim which CARRIER has not paid or denied for a legally valid cause or reason within ninety (90) days of presentation of the claim.

J. Limitation of Liability. EXCEPT AS EXPRESSLY PROVIDED HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, OR LOSS OF PROFITS, WHETHER ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF BREACH OF THIS AGREEMENT, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE), OR OTHERWISE; PROVIDED THAT THE FOREGOING SHALL NOT APPLY TO CARRIER'S INDEMNIFICATION OBLIGATIONS FOR THIRD PARTY CLAIMS.

K. Survival of Provisions. The provisions of this Section shall survive cancellation, termination, or expiration of this Agreement.

13. **INDEMNITY**. To the fullest extent permitted by law, CARRIER shall defend, indemnify, and hold harmless BROKER and its affiliates, together with BROKER's Customers, agents, insurers and reinsurers, successors, and assigns, and each of them, jointly and severally, from and against any and all claims, liabilities, damages, demands, expenses, including without limitation reasonable attorney fees or other professional fees, actions, and causes of action, suits at law and proceedings in equity, arising out of or in connection with (i) the operations and activities of CARRIER hereunder, as a motor carrier or otherwise, (ii) CARRIER's performance of Services pursuant to this Agreement; (iii) any breach of CARRIER's obligations under this Agreement, (iv) claims made by or on behalf of CARRIER's employees for salary, compensation, benefits, or payments resulting or claimed to have resulted, in whole or in part, from CARRIER's Services; (v) violation by CARRIER, of any federal, state, provincial, territorial, or local law, rule, or regulation; and (vi) claims, demands, and suits by other carriers or intermediaries against BROKER or its Customers seeking payment for transportation charges on shipments tendered to CARRIER.

A. CARRIER's indemnification obligations set forth above shall not apply to the extent the claim, demand, liability or expense is caused by the negligence of BROKER or its Customers.

B. The provisions of this Section shall survive cancellation, termination, or expiration of this Agreement.

14. **MISCELLANEOUS**.

A. Independent Contractor. It is understood and agreed that CARRIER is an independent contractor and not an agent, joint venturer, owner-operator, or employee of BROKER. CARRIER has sole and exclusive direction and control over the manner in which CARRIER and its employees, contractors, or others perform Services. Such individuals shall be considered employees or representatives of CARRIER only and shall be subject to employment, discharge, discipline, and control solely and exclusively by CARRIER, which shall be fully responsible for their acts. It is acknowledged and agreed that BROKER has no control of any kind over CARRIER or its operations, employees, drivers, or equipment. BROKER is not and will not be responsible for any debts, liabilities, or obligations incurred by CARRIER in the performance of its business. CARRIER assumes full responsibility for all commissions, salaries, insurance, taxes, pensions, and benefits of CARRIER's agents, contractors, sub-contractors, and/or employees in connection with CARRIER's performance pursuant to this Agreement.

B. Non-Exclusive Agreement. CARRIER and BROKER acknowledge and agree that this Agreement is not exclusive, and either Party may enter into similar agreements with other carriers, brokers, or freight forwarders.

C. Waiver of Provisions. Failure of either Party to enforce a breach or waiver of any provision or term of this Agreement shall not be deemed to constitute a waiver of any subsequent failure or breach and shall not affect or limit the right of either Party to thereafter enforce such a term or provision. To the extent that any provision and right or remedy provided in this Agreement conflicts, or is otherwise inconsistent with, the rights and remedies provided under the Interstate Commerce Commission Termination Act or other laws and regulations, such rights and remedies are hereby expressly waived and the provisions of this Agreement shall prevail to the fullest extent permitted by law pursuant to 49 U.S.C. 14101(b), except with respect to motor carrier registration, insurance, or safety fitness. Without limiting the foregoing, the Parties agree that the rights conferred by 49 C.F.R. 371.3(c) are expressly waived for all purposes.

D. CARRIER's Option to Assign its Accounts Receivables. CARRIER may assign its accounts receivables under this Agreement to a third party. In order to do so, CARRIER must:

i. Notify BROKER in writing at least thirty (30) days in advance of any change in the CARRIER's direction for payment. Notice must include a self-addressed, stamped, return acknowledgement for BROKER to execute and return. Notices to BROKER shall be sent to:

Coyote Logistics, LLC
960 North Point Parkway, Suite 150
Alpharetta, GA 30005

ii. Inform any assignee of the terms of this Agreement, including these terms regarding notice requirements.

iii. During the transition period from one set of CARRIER's payment directions to another, CARRIER agrees that payments inadvertently made by BROKER in accordance with earlier payment directions shall constitute full satisfaction of BROKER's payment obligations under this Agreement. CARRIER further agrees that in such event it is the responsibility of the CARRIER to forward, or cause to be forwarded, the payment to the correct party. CARRIER shall indemnify, defend, and hold harmless BROKER from and against all liabilities, losses, damages, claims, suits, or expenses, including, without limitation, attorney fees, caused by or arising from any failure on the part of the CARRIER or any assignee to comply with the terms of this Section. In no event shall BROKER's right or ability to offset any claims which it may have against CARRIER pursuant to this Agreement against any monies otherwise owing to the CARRIER be limited or negatively affected, in any manner, by the assignment, factoring, or other transfer of CARRIER's right to receive payments referred hereinabove. Deduction of trip advances from payment for freight charges for a

specific shipment shall not be modified or affected by any factoring or assignment of receivables by CARRIER.

E. No Back Solicitation/Transportation.

i. CARRIER shall not knowingly solicit any Customer or payor of freight and transport or arrange for the transportation of such freight directly for such Customer or payor of freight who first was introduced by BROKER to CARRIER. This restrictive covenant relates only to the traffic lanes or territories served by CARRIER on behalf of BROKER and Customers of BROKER with whom CARRIER had substantial business contact during the twelve (12) months immediately preceding such solicitation. The term of the prohibited solicitation and transportation shall be during the Term of this Agreement and for one (1) year thereafter.

ii. In the event of breach of Section 14(E)(i) above, BROKER shall be entitled, for a period of six (6) months following such breach, to liquidated damages equal to fifteen percent (15%) of the gross transportation revenue (as evidenced by freight bills) received by CARRIER for the transportation of said freight. Additionally, BROKER may seek injunctive relief.

F. Confidentiality.

i. In addition to confidential information protected by law, statutory or otherwise, CARRIER agrees that all business, technical, and financial information of BROKER and that of its Customers obtained by CARRIER, including but not limited to, freight and brokerage rates, amounts received for brokerage services, amounts of freight charges collected, freight volume requirements, personal information, and shipping or other logistics requirements shared or learned, shall be treated as confidential and shall not be disclosed or used for any reason without prior written consent of BROKER.

ii. In the event of violation of this Confidentiality Section, CARRIER agrees that the remedy at law, including monetary damages, may be inadequate and that BROKER shall be entitled, in addition to any other remedy it may have, to an injunction restraining CARRIER from further violation of this Agreement.

iii. **NOTICE OF IMMUNITY FROM LIABILITY FOR CONFIDENTIAL DISCLOSURE OF A TRADE SECRET TO THE GOVERNMENT OR IN A COURT FILING:** Notwithstanding anything herein to the contrary, under the Federal *Defend Trade Secrets Act of 2016*, an individual may not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order. Nothing herein is intended, or should be construed, to affect the immunities created by the *Defend Trade Secrets Act of 2016*.

G. Notices.

i. All notices provided or required by this Agreement shall be made in writing and sent via overnight courier, certified mail, or personal delivery, return receipt requested, to the person or persons and at the addresses shown herein with postage prepaid.

ii. The Parties shall promptly notify each other of any claim that is asserted against either of them by anyone arising out of the Parties' performance of this Agreement.

iii. Notices sent as required hereunder, to the addresses shown in this Agreement shall be deemed sent to the correct address, unless the Parties are notified in writing of any changes in address.

H. Severance/Survival. In the event any of the terms of this Agreement are determined to be invalid or unenforceable, no other terms shall be affected, and the unaffected terms shall remain valid and enforceable as written. The representations, rights, and obligations of the Parties hereunder shall survive termination of this Agreement for any reason.

I. Counterparts and Electronic Signature. This Agreement may be executed in any number of counterparts, each of which shall be deemed a duplicate original, but all of which together shall constitute one and the same Agreement. The counterparts of this Agreement and all ancillary documents (appendix, schedule, or exhibit) may be executed and delivered by facsimile or other electronic signature by any of the Parties to any other Party.

J. Entire Agreement.This Agreement, together with any Incorporated Documents which are a part hereof, contains the entire understanding of the Parties and supersedes all verbal or written prior agreements, arrangements, and understandings of the Parties relating to the subject matter stated herein. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence such as a BOL (except as provided within Section 7), CARRIER's tariff, web site, or otherwise may be introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement. Notwithstanding the foregoing, the Parties understand that certain appendices or amendments in connection with previous Broker-Carrier Agreements or Carrier Agreements between the Parties (each, a "Prior Incorporated Document") will be considered an Incorporated Document if such Prior Incorporated Document was agreed to by the Parties in writing and (i) is not superseded by an Incorporated Document to this Agreement relating to subject matter that is the same or materially similar to a Prior Incorporated Document or (ii) is not explicitly cancelled in writing by CARRIER.

K. Modifications. No amendment or modification of the terms of this Agreement shall be binding unless in writing and signed by a duly authorized representative of both Parties.

L. Right to Review with Counsel. Each Party warrants and represents that it (i) has had the opportunity to consult with an attorney of its choice, (ii) has

carefully read and fully understands all the provisions of this Agreement and (iii) is freely, knowingly, and voluntarily entering in this Agreement. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived.

M. Governing Law-Venue. Any legal action arising under or pursuant to this Agreement shall be brought and maintained solely in the State or Federal courts located in Cook County, Illinois or Fulton County, Georgia and shall be governed by and construed in accordance with the laws of the State of Illinois without regard to choice of law provisions.

N. Force Majeure. The performance of either or both Parties hereto shall be excused and abated if such is prevented or substantially impeded by any Act of God, the public enemy, the authority of law, natural disaster, or other like event, for the duration of such event. The Party who is unable to perform shall give the other notice within twenty-four 24 hours of the occurrence of such event or its performance hereunder will not be excused.

O. Enforcement/Attorney's Fees. In the event that any action, suit, or other legal or administrative proceeding is instituted or commenced by either Party hereto against the other party arising out of or related to this Agreement, the prevailing Party shall be entitled to recover its actual attorney's fees, costs, and expenses from the non-prevailing Party. For claims arising out of the loss, damage, or delay of any shipment, BROKER shall also be entitled to interest at the legal rate from the date of delivery or the scheduled date of delivery if a complete loss.

P. Assignment. Neither Party shall assign this Agreement or its rights or obligations hereunder without the other Party's prior written consent. Subject to the foregoing limitations, this Agreement shall be binding on the Parties' respective heirs, successors, and assigns.

Q. Currency. All amounts shall be in United States Dollars, except to the extent an alternate currency is set forth on the Load Confirmation Sheet.

R. Equal Opportunity. In the performance of Service pursuant to this Agreement, the Parties hereto shall comply with the equal opportunity provisions as set forth in Federal Acquisition Regulation (FAR) § 52.222-26.

S. Compliance with Executive Order 13496 of January 30, 2009. CARRIER agrees to comply with all provisions and related rules, regulations, and orders of the Secretary of Labor as set forth by Executive Order 13496 of January 30, 2009.

T. General Provisions and Interpretation.

i. Where applicable, reference to local laws, statutes, and regulations and standards in the Agreement and the Appendices include the applicable Federal, Provincial, Territorial, Municipal, and local laws, statutes, regulations, and standards in force in Canada and/or Mexico.

ii. Where reference is made to government officials or regulators in the Agreement, such reference shall include the equivalent Canadian and/or Mexican counterpart.

iii. References to laws, statutes, regulations, and standards mean such laws, statutes, regulation, and standards as they may be amended, supplemented, and replaced from time to time.

iv. The term *"including"* shall mean including without limitation, regardless of whether such words are used in some contexts but not others.

U. Foreign Corrupt Practices Act. CARRIER represents and warrants that it is in, and shall continuously maintain, full and strict compliance with the U.S. Foreign Corrupt Practices Act ("FCPA") and all other applicable anti-corruption/bribery laws in effect in connection with the performance of this Agreement. CARRIER agrees that during its performance of this Agreement, it will not, directly or by means of an intermediary, offer, promise to pay, or pay, any money or anything else of value to any government officer (or candidate to a public position), officers of international organizations, or a political party or official entity, with the purpose of influencing an official decision, inducing the officer to act or omit any act or guarantee an unlawful advantage. CARRIER represents and warrants that neither it, none of its employees or officers is a government official, officer of a political party or a candidate of a political party; and no government official or officer of a government agency or entity is or will be associated with or has or will have an interest in the Agreement or the payments made by BROKER pursuant with this Agreements as a result of any act or omission by CARRIER. CARRIER agrees to promptly provide documentation as reasonably requested by BROKER to verify the foregoing. CARRIER represents and warrants that that it is familiar with all applicable anticorruption laws, including the FCPA, and all anticorruption laws in effect in the countries in which CARRIER performs or will perform its business. CARRIER shall require that any other carriers utilized by CARRIER to perform its obligations (to the extent permitted herein), including, without limitation, carriers contracted by CARRIER to transport shipments within Mexico, agree in writing to requirements no less restrictive than those set forth above, and shall be responsible for any noncompliance of such requirements. Any breach to the above-mentioned obligations will constitute a material breach of the Agreement and will entitle BROKER to exercise all legal rights that may be available. Such breach will also entitle BROKER to a refund of the amounts paid to CARRIER for such shipment.

IN WITNESS WHEREOF, we have signed this Agreement the date and year first shown above.

Name of Authorized Carrier Representative: adam grey
Title of Authorized Carrier Representative: Transportation Manager
Phone number of Authorized Carrier Representati
Email of Authorized Carrier Representative: o

Agreement Date: 12/2/2022

☑ "I, adam grey, am the Authorized Representative for Roma Corp. I am authorized to execute the contract set out above dated 12/2/2022 9:34:17 AM Pacific Time

between Coyote Logistics, LLC. and Roma Corp and legally bind the company to the terms and conditions set forth therein. This electronic signature serves as an original and any electronic version and other signatures are incorporated as if originals into the original document. This electronic signature shall have the same force and effect as an original source.

BY CLICKING THE ACCEPTANCE BUTTON, I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THE AGREEMENT AND AGREE TO THE ENTIRETY OF THE TERMS & CONDITIONS CONTAINED THEREIN. THE AGREEMENT SHALL BE BINDING ON ROMA CORP. I UNDERSTAND AND ACKNOWLEDGE THAT ROMA CORP IS THE "CARRIER " AS THAT TERM IS USED IN THE AGREEMENT."

DocuSign Envelope ID: C09E549E-F42B-460B-B401-D4C633AF0E33

COYOTE LOGISTICS. a UPS Company

877-6-COYOTE
www.coyote.com

2545 W Diversey Ave
3rd Floor
Chicago, IL 60647

## AMENDMENT TO BROKER-CARRIER AGREEMENT

### Text Messaging and Electronic Tracking

This Amendment to the Broker-Carrier Agreement or Carrier Agreement (in each case, the "Agreement") is entered into between Coyote Logistics, LLC ("BROKER") and the motor carrier set forth in the signature line hereof (the "CARRIER") and is effective as of CARRIER's date of signature.

WHEREAS, BROKER and CARRIER have previously entered into a Broker-Carrier Agreement or Carrier Agreement (the "Agreement") pursuant to which CARRIER agreed to transport shipments tendered by BROKER;

WHEREAS, the parties desire to amend the Agreement as set forth below;

NOW, THEREFORE, intending to be legally bound, BROKER and CARRIER agree as follows:

1. CARRIER must be able to provide system tracking and tracing via web or the CARRIER's ELD or TMS systems, or enable BROKER to send text messages to and/or track locations using the driver's cell phone numbers. CARRIER represents and warrants that it has obtained a written agreement from each driver transporting a shipment tendered by BROKER to CARRIER pursuant to the Agreement in which each driver provides all necessary consents to (i) receiving text messages and/or phone calls from or on behalf of BROKER and (ii) allowing BROKER or its vendor to track such driver's location while transporting such shipment. CARRIER agrees to provide BROKER a copy of such written agreement upon request. CARRIER shall comply with all applicable laws relating to the collection, use, storage, retention, disclosure, and disposal of any information CARRIER provides to Broker, including information regarding the drivers transporting shipments. Such laws include, without limitation, the Telephone Consumer Protection Act ("TCPA") (47 U.S.C. § 227) and its implementing regulations (47 C.F.R. § 64.1200). Compliance with the TCPA includes, but is not limited to, obtaining any necessary consents from drivers to receive text messages and phone calls from or on behalf of BROKER. CARRIER shall indemnify, defend and hold BROKER and its affiliates and customers harmless from and against any and all claims, damages, liabilities, losses, actions and expenses (including attorneys' fees) arising out of or in connection with CARRIER's breach of this Section. This Amendment shall survive the expiration or termination of the Agreement.

2. CARRIER acknowledges and agrees that BROKER may use Registry Monitoring Insurance Services, Inc. ("RMIS") or other third-party vendors in connection with CARRIER's registration to do business with BROKER. CARRIER agrees that any personal information provided by CARRIER in connection with such registration process may be shared with BROKER's vendor providing registration services and CARRIER directs BROKER to provide CARRIER'S personal information to such vendor. In addition, CARRIER agrees that the vendor providing registration services to BROKER may share CARRIER's contact information and insurance information with other customers of such vendor.

3. <u>PROCESSING OF PERSONAL INFORMATION</u>

A. The following definitions shall apply for the purposes of this Section 3:

(i) "Broker Data" means any or all of the following, and all copies thereof, regardless of the form or media in which such items are held: (a) confidential information of BROKER, including Personal Information (as defined herein); (b) data and/or information provided or submitted by or on behalf of BROKER to CARRIER regardless of whether considered confidential information; and (c) data and/or information submitted, stored, recorded, processed, created, derived, or generated by CARRIER as a result of and/or as part of the provision of Services, regardless of whether considered confidential information.

(ii) "Personal Information" means any and all information in any medium or format which CARRIER accesses or acquires from BROKER or its affiliates, which BROKER or its affiliates provide to CARRIER, or which CARRIER collects or acquires on behalf of BROKER or its affiliates that identifies, relates to, describes, is capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer, household, or device. Without limitation, "Personal Information" includes information qualifying as "personally identifying information," "nonpublic personal information," "nonpublic information," "personal data" and similar terms under law.

(iii) "Security Incident" means any act or attempt, successful or unsuccessful, to gain unauthorized access to, disrupt or misuse an information system or information stored on such information system, including any unauthorized access, acquisition, disclosure or use of Broker Data.



Initials: DS RG

DocuSign Envelope ID: C09E549E-F42B-460B-B401-D4C633AF0E33

B. CARRIER will use and process Broker Data in compliance with applicable law at all times. CARRIER shall ensure that all CARRIER personnel engaged in the use or processing of Broker Data agree to maintain the confidentiality of such Broker Data and comply with the other relevant obligations and restrictions of this Section 3.

C. CARRIER will use and process Broker Data solely for the purpose of performing the services and/or other obligations of CARRIER under this Agreement and in accordance with BROKER's instructions as issued from time to time in writing. With regard to Personal Information which CARRIER may collect, receive, or otherwise use or process as a result of the Agreement, CARRIER shall not:

(i) Sell, rent, release, disclose, disseminate, make available, transfer, or otherwise communicate orally, in writing, or by electronic or other means, Personal Information to another business or a third party for monetary or other valuable consideration; or

(ii) Retain, disclose, collect, sell, use, or otherwise process Personal Information for any purpose other than for the specific purpose of, and as necessary for, performing the Services specified in the Agreement. For clarity, CARRIER may not retain, use, or disclose the Personal Information for any other commercial purposes or outside of the direct business relationship between CARRIER and BROKER. By execution of this Amendment, CARRIER hereby certifies that it understands the specific restrictions contained in this Section 3(D) and will comply with the same.

D. CARRIER will notify BROKER promptly via email at **privacy@coyote.com** within 2 business days if it receives any inquiry, complaint, request or claim (collectively, "**Requests**") from an individual relating to Personal Information, including any individual's request to exercise rights under applicable law with respect to Personal Information provided by or relating to BROKER or its Affiliates. CARRIER will not respond to any such Requests without BROKER's prior written consent except to the extent required by applicable law or as necessary to confirm that the Request relates to BROKER or Broker Data. CARRIER will cooperate fully with BROKER and facilitate BROKER's response to all such Requests. CARRIER will promptly provide any information requested by BROKER relating to CARRIER's Services and/or use or processing of Broker Data which is reasonably necessary for BROKER to respond to a Request.

4. CARRIER will notify BROKER by emailing **privacy@coyote.com** within 24 hours of any Security Incident of which CARRIER becomes aware which affects, or could reasonably be expected to affect, the confidentiality, integrity, or availability of (i) BROKER's information systems or (ii) Broker Data. CARRIER will fully cooperate with BROKER in execution of its security incident response plan and otherwise, and, at BROKER's request, any law enforcement or regulatory officials, credit reporting companies, and credit card associations investigating such Security Incident. CARRIER shall fully cooperate with and assist BROKER in fulfilling BROKER's reporting and disclosure obligations to any third party, including individuals or governmental authorities. CARRIER will not disclose a Security Incident to any individual, regulator, or third party without BROKER's prior written authorization. CARRIER acknowledges that BROKER shall make the final decision on notifying BROKER's customers, employees, service providers and/or the general public of such Security Incident.

5. In the event of any conflict between the terms of this Amendment and the Agreement, the terms of this Amendment shall control. Except for that explicitly amended herein, all other terms and conditions of the Agreement shall remain in full force and effect.

The parties have caused this Amendment to be duly executed as of the date set forth below.

**Coyote Logistics, LLC (BROKER)**

**USDOT: 2236410**

**Signature:** Ryan Cook Digitally signed by Ryan Cook Date: 2021.11.10 12:23:18 -05'00'

**Printed Name:** Ryan Cook

**Title:** Sr Director, Risk Management & Compliance

**Date:** 11/10/21

**Carrier Legal Name:** ROMA CORP

**USDOT:** 3870039

**Signature:** DocuSigned by: adam grey 43E10CB3FC8340...

**Printed Name:** adam grey

**Title:** ops manager

**Date:** 12/2/2022

**Email:** [illegible]